The first case we're going to call is 513-0512, ASAP Contracting & Roofing v. Nolan. Gentlemen. May it please the Court. Good morning, Your Honors. My name is Brian Callaghan. I'm the attorney for ASAP Contracting & Roofing, LLC, who is the plaintiff in the underlying action and the appellant in this case. We're before the courts on a judgment entered against ASAP Contracting & Roofing in a bench trial in the Circuit Court of Madison County. The case involves a breach of contract and defective workmanship on my client's part. In the breach of contract action, my client asserted it was to collect funds due as a result of my client's work on Nolan's home. I'm before the court on a very specific legal issue, so I don't believe we'll take much time in the argument, but I will give you a bit of background as it relates to the factual recitation. ASAP is a roofing contractor in Columbia, Illinois, and Jim and Linda Nolan are homeowners in Edwardsville, Illinois. The Nolans sustained hail damage to their home in June of 2010, and following that storm, they started experiencing leaks in their home and recognized damage to shingles on their roof. The Nolans made a claim on their insurance policy, which was their insurer was Madison Mutual. They had a replacement policy, meaning that Madison Mutual was obligated to pay the Nolans an upfront actual cash loss based on the value of the roof at the time of the loss. And if the Nolans were to make corrections or repairs to the roof, that the insurance company would pay the Nolans for the replacement costs incurred by the Nolans in an effort to correct the roof. The Nolans had my client, ASAP Contracting and Roofing, look at the roof and the damage. There was damage both to the roof itself and some interior damage. My clients entered into a contract with the Nolans to do the roof work and interior work. And part of the contract was that they would be entitled to all funds received from the Nolans for the insurance that they received from Madison Mutual. Madison Mutual originally adjusted the claim as approximately $16,000. Part of the roofing contract is that if my client did any additional work or negotiated any supplements, that those funds would pay directly to my client. And to be clear, the Nolans would not receive any additional funds unless work was done to the house after the actual cash value came. So when Madison Mutual issued the actual cash value check of $10,581 for the value of the roof initially, the Nolans remitted those funds to my clients and my clients started the work. And then my clients did the work on the home and then negotiated with Madison Mutual for what they call supplemental funds, supplemental payments for additional work. Did Madison Mutual actually send out an inspector to inspect the roof? Yes, they sent out the claims adjuster and they hired an independent company to do inspection. So after my client did the work, a gentleman named, I believe, Matt Dunn from Madison Mutual visited the house. Plus an independent inspector? Yes. I think, but to be clear to the board, the independent inspector was, I believe he was out there before the work was done to adjust the claim to figure out how much the actual cash value was or the depreciation. Just like $18,000 for that insurance check? Well, yeah. After my client does the work, they negotiate with Madison Mutual to figure out how much my client would be paid. And in the end… Almost $19,000, right? Yes. That was kind of a negotiated amount. Yes. And the way it works, I believe, in catastrophic claims for roofing companies, they will go out and try to sell themselves or market themselves to areas that are hit by storms. And they go basically door-to-door signing up jobs. And then once they sign up the job, get the contract, they'll do the work and then negotiate with the insurance company for the appropriate amount of payment. And those contracts are just like we have here, ASAP contracts, that we will do the work for the homeowner. The homeowner will not experience any out-of-pocket except for the deductible. To the extent that we negotiate a larger sum, we get those larger – we get that payment. So the homeowner is never out-of-pocket, but whatever the contractor negotiates, he keeps. So in this case, my client does the work. Madison Mutual adjuster sends an email to my client informing him that the total payment to the insurer, which is the Nolans, is $22,472. However, of that amount, we have roughly $3,500 in interior repairs ASAP did not do. So the total amount of payment for ASAP is $18,970. The rest is for the Nolans to get interior damage repair. There was a discrepancy in the briefs between the amount due. One place had $7,823.33 and the other place had $8,388.32. Let me explain. So at trial, my client – the evidence that my client put on was that the amount he would be due is $7,823.33. The reason for the discrepancy is at trial, my client discovered there was some profit associated with work he did not do on the $8,389 he originally prayed for. So at trial, he asked for less than what was the original prayer in the complaint. So the prayer that was ultimately asked for was the $7,823.33. Yes, sir. You didn't attach the contract to your appendix, did you? I don't know, Your Honor. It would be in the record. I don't know. I understand. It's very helpful to have a contract in the appendix because there's only one record and we can't all three have it at the same time. That's the reason for the appendix. And for future audit. I will make that note. Just to point that out. Was there an interest provision in the contract? There was an interest provision and an attorney's fee provision. At trial, my client asked for interest and attorney's fees, which would have exceeded the $10,000 small claims threshold. So he's limited his total prayer to $10,000. So you filed under the Small Claims Act and capped your damages at $10,000? Yes, Your Honor. Okay. After the work was done, the homeowner complained of some leaks. My client sent someone out and attempted to correct the leaks by applying some silicone to the shingles where they believed the leak was coming in. My client didn't hear anything further from the Nolans regarding any issues with the roof or their work. My client demanded payment. Payment was not received. My client sued the small claims. The Nolans counter-sued for defective workmanship. They asked for damages against my client. And as a defense to my breach of contract claim, they assert the defective workmanship. At trial, my client puts on the evidence that the work was completed. There was a contract that the work was performed and that the insurance company released funds of nearly $19,000 for that work. So but for that work, those funds would not have been released. The Nolans put on evidence by two witnesses. They hired a roofer, a competing roofer, to issue a report regarding what this expert claimed was a substandard performance or substandard work. And his name was Perry Flint. And he outlined eight things that he believed my client didn't do correctly but didn't give any kind of damage associated with them. Indeed, he said that these issues may result in future problems that may occur. And if there was future problems, my client should be responsible. That's his conclusion. So his conclusion was more or less in my mind kind of like there may be warranty issues that come up due to my client's work. If those are warranty issues that do indeed arise, my client should be responsible. Then Mr. Nolan testified that in his mind there was substandard work because of some chip shingles. There was no new flashing. And there was, he claims, a leak in the kitchen, which apparently this event occurred in 2010 but had not been corrected at the time of trial last year in September. So what was able to be deduced at trial was that when Perry Flint, their contracting expert or the roofing expert, visited the home, he found a leak and corrected that leak for $150. And then the Nolans, Mr. Nolan, had guttering installed for $925. So that's the only evidence of damage that were put on by the Nolans. But if you read the report by Sander, the report there is that Mr. Flint described that Flint's work is extremely poor and did not have any estimate of how much it would cost to correct any defects. That's correct. He did opine that my client's work was extremely poor. He did that my client testified that it wasn't the trier of fact concluded that apparently my client did not complete the full contract. I guess there was some kind of defective work that the judge found credible in this report. My, and I'm going to get to the essence of my argument in a second. I just want to complete the, kind of the factual background is that after the funds were released to the Nolans, it came out of trial that Mr. Nolan didn't understand that the actual cash value was only the actual cash value and that there would be an additional payment. That he took those additional payments that he received from the insurance company. Instead of paying my client what was due, he bought two doors for $10,000. So we have a situation where my client was praying for $7,823.33 and there was evidence of damage of $925 for guttering and $150 to correct a leak. The judge found in favor of the Nolans on a migration contract claim and against the Nolans on their defective workmanship claim. The Nolans did not seek appeal from their judgment that was against them. And I am here before the court on the judgment that was entered against my client. What evidence of attorney's fees did you put in? I had a, I believe there was a, I believe there was an affidavit in the record. The issue of the attorney's fees is secondary to the issue of just getting compensation for the client, the compensatory loss that we were claiming. But if the attorney fees exceeded a certain amount, then you would go over the $10,000? Yes. Was that what happened at trial? Well, yeah, my attorney's fees would exceed the small claims limit. But for purposes of the prayer that we were asking the judge to enter was limited to $10,000. We would not ask the judge to entertain or enter anything more than $10,000. So, Your Honor, the issue really, in my mind, the legal issue is we put on, ASAP put on evidence of work that was performed and supported by a money paid by Madison Mutual. And again, but for that work, the Nolans would have never received that money. They would not have two new doors in their house. What I believe the issue was, is that, is one of verdict proof. Because the Nolans said that there was defective workmanship. The evidence of defective workmanship is the guttering of 925 and the leak correction of 150. But the judge said that my client recovers nothing. And I assume that may be because the defects that were outlined in the report of their expert, which did not have any kind of specified amount of money accompanied to it. He talks about future damages that might be associated with the shoddy work. So the judge, I believe, concluded, and I'm extracting this from the judgment, which was simply held against us. And the line was favorable to the record and to the Nolans, that that shoddy workmanship was enough to keep my client from recovering anything. My- Well, the judge, I mean, couldn't the judge have determined that your client failed to prove that it substantially performed the contract? And then on the other hand, found that the Nolans failed to prove damages, and so both sides lost? That's possible. And as far as on the, you know, your client's side of that, I mean, there was competing evidence about the workmanship. And so why would that be against the manifest way of the evidence? Because there is evidence that the insurance company issued payment for the work that my client did. Trial court's not bound by that, is it? No, but there would be. So then who gets to keep the funds for the work that my client did? My client- I mean, it's a failure of proof. I mean, it may be that the – if the defendants had put on evidence, they might have been awarded $10,000 or whatever for repairs. But they wouldn't prove damages. And I believe there is a competing analysis here that the defendant didn't put on – obviously for bail on their burden of proof on defective workmanship. And my clients put on evidence of satisfactory work that was not believed to be credible, I guess, by the judge. But the argument is if – who has the burden of proof on the defective workmanship side? My clients put on the evidence that the work was completed and funds were issued for that work. If there was going to be a claim of defective workmanship, then the defendant should have put on evidence of the amount of defective workmanship that would have been set off against my client's work. Instead, my client did the work, funds were released, and then the insured gets to keep the entire amount of the money that was released because of my client's work. In this case, it would have resulted in an over $6,000 windfall to the insured. If that's the case, then it wouldn't – any homeowner would be able to have incentive just to keep the funds from the insurance company against the roofing contractor's work. It's not a windfall if in the future the Nolans have to get their roof repaired a bunch of times because of shoddy workmanship. And then there would have been – there was no evidence of the amounts or the extent of such damage. There was just a report saying that there may be future problems, and if there was future problems, my client had a warranty on that work. It wouldn't mean that they'd get to keep all the funds because of the possibility that someday they would have to pay to correct work when my client warranted the work anyway. So the contract had a warranty provision? Yes, Your Honor. And Ms. Perry Flynn, didn't he testify that the workmanship was not causing any immediate property damage? That's correct. That's what he said? Yes. So, Your Honor, for those reasons, I asked the court to conclude that there was error made by the trial judge in concluding that my client recovered nothing from the Nolans. And that the evidence in the record shows that the Nolans did incur some expense as a result of my client's failure to properly perform the entire contract, one being that they incurred the expense of $150 to correct a leak and that they had purchased a guttering system for $950. So I was – Had the guttering system been included in your contract? My client was supposed to put up the guttering system and did. They were supposed to do – this is an aside, and I believe it's particularly relevant for both my weight and background. They were supposed to do – the initial estimate my client provided was for interior work, and my client didn't do some interior work. Apparently, after the initial hailstorm, there was leaking inside the house, causing discoloration in the paint. My client initially provided an estimate to correct that work that Madison Mutual accepted. My client didn't do the work, so Madison Mutual said that they were withholding or my client shouldn't be paid $3,500. My client never asked for that money from the Nolans, so that's the essence of my claim of error, and that's my prayer to people at work. Mr. Tamiano? Thank you. May it please the court, opposing counsel, my name is Larry Tamiano. I represent the Nolans on this appeal. I did not try the case in the court below. Just as you are, the only basis I have for determining the record is what is in the record itself. The first thing that struck me is the pleadings where the plaintiff filed their complaint, and which is still the only pleading on file, saying that they performed all conditions under the contract. Well, it didn't take too long to get into the record to see that all conditions of the contract were not performed. The first thing, of course, is the contract said that the contractor was going to get a building permit, and they did that. A second item, which of course was discussed, is that the roofer here was not licensed in Illinois. At no time, or any of the work that they did, did they have a licensed roofer. The person that they had testified trial hadn't performed any of the work. So, there was... How does that impact on the quality or value of the roof? Evidentially. We have one person testifying that the work was poor. The work that was done, of course, the plaintiff here argues that not all the work met the standards, but I believe that it's important from an evidentiary standpoint to know whether that person is licensed in the state of Illinois. That credibility? I think the court can look at all of those factors. I am not claiming it's dispositive. Although I can claim, and I believe it would be fairly obvious, that someone wanting to hire a roofer for work on their property would want someone who's licensed in the state. And then it came up later on, and I believe you raised the question, well, wasn't there a warranty? Well, by the time people are starting to stand on warranties, doesn't someone have the right to say, look, if you're claiming a warranty on this property, you should at least be licensed in the state to do it. There's no Illinois law requiring that, is there? I believe there is. You have to be a licensed roofer to perform roofing in Illinois? I don't know, I'm asking. I think that's required. Okay. And there are citations to that argument in the record that didn't come up, at least in terms of the- But your expert, as I understand it, Mr. Flynn, testified that the workmanship was not causing any immediate property damage to the home. I'm not sure I agree with that interpretation of what he testified to. Okay. Did he give an estimate as to how much it would cost to correct any of the defects he saw? No. So there was no evidence on repair, except for the 150 and 925. There was no evidence of the cost to repair. Right. He said that it was likely to cause future damage. I agree. He didn't say it was likely to cause future damage in the amount of $3,624.73. And I think that's one of the issues I have with the appellant here. He is arguing because some of the damage problems were not quantified, that that means there wasn't damage. And because there was no specific quantity given to the defect. Did you agree with the bystander report? Did you agree with that? I was not the one who prepared the bystander's report, but I believe I'm bound by it. My predecessor agreed with that. By the trial judge. By the trial judge. Approved it, although I believe both attorneys agreed to it. Okay.  Right. And you agree within the report? I agree. That's the report that was approved by both attorneys and signed off by the trial court. I wasn't there. Okay. That's our record, whether you like it or not, right? Yeah, but I have no reason to disagree with that. And it looks to me like you've got a specific site. No. No, go ahead. Go ahead. All right. There was also an exhibit elaborating on Perry Flynn's testimony. And I believe I wanted to give you that site. It's on, I think, page three or four of the bystander's report and also exhibit B. There's an outline of Perry Flynn's testimony, which was in one of the exhibits at trial, where he went over a lot of the issues. Once again, one of the issues, and keeping in mind that the complaint says they complied with all terms of the contract, I mean, it's uncontested that the plaintiff did not perform the guttering or the material work. Perry Flynn gave a long list of things that he found wrong. Now, as I said, he didn't quantify them, and he didn't say when, and he didn't say how much the problem would be, but he did testify that it was nonstandard workmanship likely to cause future damage. And as I believe was pointed out, the fact that it wasn't quantified may well have played a role in the norms using on their counterclaim. But one of the elements of proving a claim for a contractor is that the work was performed in a workmanlike manner. So there was testimony that it was not done in a workmanlike manner. There was also not a whole lot of testimony on how much that was worth and how much it entitled the homeowner to, which results in something that people see from time to time where both sides lose. So what rule of law do you believe applies to this case? Quantum merit, contract law, breach of contract? I think the way it's developed, it is clear that we're not talking about a breach of contract in terms of performing all the conditions of the contract. I mean, even the testimony seems to indicate there were some shortfalls. I believe what the real issue is, and notwithstanding it's not in the pleadings, is whether this is substantial performance or not substantial performance. If it's not substantial performance, then you evaluate it from a quantum merit type of situation. I believe that what the plaintiff should have pled, and I'm deducing this from their arguments, is that they should have made the claim that this was substantial performance. I mean, if nothing else, the contract says specifically that they're going to get a building permit, and they didn't do that. Well, that can lead to some consequences for work done on the roof. For one, it may mean that there was no city inspection to look at the quality of the roof before it was approved. That was just never done. So at least that key component of the contract wasn't performed. Now, under substantial performance, you know, if a contractor overlooks a $5 item, you can't defeat them on the contract for that. There's a specialized body of law that's developed because when it comes to contracts and contractor work, it's hard to get everything 100%. So you have a substantial performance and deduct according to the problem. However, if it doesn't rise to the level of substantial performance, if it is something less than that, and I cited in my brief the two elements of substantial performance are good faith in the contract, and essentially did the work substantially conform to the contract. Now, one of the key elements in establishing substantial performance is quality of work. If the quality of work does not meet the industry standards, or if the work was not done in a workmanlike manner, then you're relegated to quant merit. And it doesn't mean that you can do work even if there are substantial problems with it. It doesn't mean that you can't recover for some of the work that you did do. So if we assume that there was not substantial performance, let's just assume that. Okay. Do you think that the issuance of the check from Madison Mutual can give rise to an inference as to the value of quantum merit? Have you seen that research? Under here, no. I mean, there was nothing about this where Madison Mutual verified the quality of the work. They checked to see if it was done. And I mean, is there a roof there now? So there was no inspector? There was nobody verifying the quality of the work. And I might add that even when they were trying to evaluate the claim for how much it was going to cost to work on the roof, I mean, there was discussion from Madison Mutual in the exhibits where they had some real problems with this estimate. And they had some questions about this contractor. That's an email from Charles Alvers. It's on the ASAP exhibit page 48. But there's actually a discussion about this estimate. Notwithstanding that, ultimately it got approved. When the work was completed, they issued the check. But by that time, there were already questions about the quality of the roof. There was testimony from the Nolans, which has not been – it was admitted that the roof still needs. Now, in the brief, the way it's cited is it says from time to time the roof leaked. Well, that's not in the bystanders report. But the bystanders report says this roof leaked. It did not do its fundamental job of keeping the yellowness on the exterior of the building. So I think that is something that the trial court can consider. I mean, there are differences of opinion about what the court should have done. But what you do in those cases is you bring in evidence, trial court listens to both sides, and then tries to determine who to believe. There was testimony here that the roof does not serve its essential function. It does not keep the rain out. I believe that allowed the court to consider that there was not substantial performance. When you get a roof, you want it to keep the rain out. Now, there was an argument, or actually what I believe is designed to be an argument, to argue that Mr. Nolan should not be believed. And that is, well, ASAP came out once to fix it, and then we never heard from him again. Well, I think the argument goes that that therefore means that there wasn't really a serious problem. But at that point, we have a homeowner who knows that, who's seen the work that's been done before. It was of poor quality. They called him out on a repair. That didn't fix the problem. Turns out the roofer is unlicensed in the state of Illinois. I can understand why the owner may have decided at that point not to go back to this particular contract. But your owner didn't call his insurance company either. Pardon me? The owner. Did the owner call the insurance company? To say this still isn't working? Well, a letter issued from the insurance company explaining that they were going to make an additional payment. Did your client object to that? I think what I gathered from all of this is they wanted to be done with the process and to settle with the insurance company as soon as they could. So I believe that they took the money and are now trying to explore other options for fixing the roof. But they knew the money was coming for the roof. Instead, they bought two doors. Yes. So they didn't let the insurance company know that there were all these problems. They didn't try to take it through the insurance company is what I gathered here. Now partly, as he alluded to the testimony, the no's were a little unclear as to how the process worked. But they're left with a roof that now needs additional work. My clients did not have testimony about what that additional work will cost. They lost on their counterclaim, which I believe is at least in part related to something like that. There was no proof of the numbers. But they have or had the money and they're going to face this obligation to do something about it. But I would argue that for the most part, the insurance claim is something different than this claim. Well, all the insurance company cares about is getting released from any further claim. I believe so. I mean, they gave no one's here's the money, fix your roof, don't fix your roof, just release us. I think the last thing they want to do is get involved in some kind of warranty issue or breach of warranty issue with the contractor. And I think my people were delighted to get rid of the insurance issue. I think they want to get rid of the contractor issue as soon as they can. Just to make sure I understand here, I mean, the insurance company didn't pick ASAP roofing. They did not. No one's picked ASAP roofing. That's correct. The sole function of the insurance company was to pay the claim. Right. And like I said, if you look at the internal emails, Madison Mutual had its questions about the contractor. But once again, they didn't try to substitute one. And they eventually came up with what the amount of payment should be. And it was only later that we got the homeowner to see that the roof still needs. And, you know, they got another roofer who said the quality of this is poor. That was $19,000 for the roof. I don't recall. About $19,000. Yeah. And they paid about $11,000. And there is damage of some nature to it, which is going to have to be addressed. But no one's testified they were going to get further work. Rightly or wrongly, they decided to wait until after the litigation to determine what they were going to do. And I believe that's still where we are. There's further work to be done. The amount is unspecified. No one's claim to try to get what it was going to cost to fix this was denied because they didn't have the numbers. But I don't think the contractor at this stage, and in light of this testimony, can come in and say, I've done everything that I'm required to do. Therefore, you know, give me all of this money. You got paid from the insurance company. I want that. They still, the only licensed roofing... Okay. The only licensed roofer that they have is one that the testimony was that he's on with this company so that they can try to get paid for all of the projects. He's not necessarily going to do the work. And it says right in the bystander's report that this relationship is not necessarily in compliance with the state of Illinois's requirements. And that's in the bystander's report. Okay. Thank you very much. Thank you. Rebuttal? Mr. Campbell? Just to address a couple issues. Mr. Taliana referenced some issue that the insurance agency or the insurance company may have had with ASAP. The issue was when ASAP attempted to negotiate the supplemental payment with Madison Mutual. Madison Mutual did not accept ASAP's initial supplemental estimate. And they negotiated that. The Madison Mutual ultimately decided that $22,000 would be issued, of which approximately $19,000 would go to my client. Since it's a replacement value policy, the insurance company does care about the work that's performed. Because if the work was not performed, there would be no issuance of any payment. But they're off the hook once the payment's issued and they're released. They're going to be the insurance company issuing payment for the replacement value. They have no responsibility for the warranty. My client wouldn't have done that. But I agree. I mean, they can't go. Once they release the insurance company from any further claim, they can't go back and get any more money. Do you agree with that? Yeah, I agree with that. So the money was dedicated for the roof. And instead of buying a roof, instead of paying my client for the roof that my client did work on, they bought two new doors. And I guess that's part of the issue here is my client did the work. The money was released. The evidence in the record shows that Mr. Nolan didn't understand that after the actual payment was made, that he was responsible for the additional work that my client did that would achieve the payment of the replacement value. So he took the check, bought two new doors, and then complains of defective workmanship, which the only evidence was that the damage was $925 for guttering, $150 for a leak. So those are the only issues that I wanted to bring up on rebuttal. Thank you. Thank you. Okay. Thank you, counsel. This matter will be taken under advisement, and a disposition will be issued in due course.